# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

ANNE M. SHOULTS,

        Plaintiff,

  v.                                  Civil Action 2:19-cv-1425
                                       Chief Judge Algenon L. Marbley
                                       Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Anne M. Shoults, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 12) be **OVERRULED** and that judgment be entered in favor of Defendant.

**I.    BACKGROUND**

Plaintiff filed her applications for DIB and SSI on February 26, 2015, alleging that she was disabled beginning August 31, 2014. (Doc. 9, Tr. 412–424). After her applications were denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on September 28, 2017. (Tr. 183–195). The hearing was continued, and a second hearing was held on March 13, 2018. (Tr. 196–220). On June 25, 2018, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 10–36). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–9).

Plaintiff filed the instant case seeking a review of the Appeals Council's decision on April 15, 2019 (Doc. 1), and the Commissioner filed the administrative record on September 3, 2019, (Doc. 9). This matter is now ripe for review. (*See* Docs. 12, 14, 15).

**A. Relevant Medical Evidence**

In this matter, Plaintiff's mental and physical limitations are at issue. The ALJ thoroughly summarized Plaintiff's medical records pertaining to both:

**A. Physical**

> . . . The claimant had a history of complaints from her spinal impairment with a history of back and leg pain with numbness and tingling. (Exhibits lF, 2F, 3F). She had a L4-L5 laminectomy, fasciectomy, foraminotomy, fixation, and fusion on June 2013. (Exhibit lF, page 1).
>
> Since the alleged onset date, the claimant had a significant gap in medical treatment records. In November 2015, the claimant saw a treatment provider for the first time in a year. She came to ask a doctor if he was "on board" with filling out paperwork for her disability application. She also reported having tingling, which was a new problem that started about six months ago. She claimed to constantly have this tingling. She also reported fatigue and numbness in her feet and left hand. She was on significant pain medication, which she reported provided no relief. (Exhibit 6F, page 1).
>
> In December 2015, she was seen at a panic management provider. She reported having constant worsening low back pain. She reported an aching, burning, cramping, shooting, and stabbing pain that would radiate down both legs to her feet. She reported having stiffness all day. She indicated she had leg pain, numbness, and tingling. She indicated she had no had physical therapy in a long time and never gotten injections. She claimed she usually could not get out of the house and could not go walking. She reported her pain medication made her foggy and loopy. (Exhibit 7F, page 1).
>
> In March 2016, she was being tapered off her Methadone . (Exhibit 9F, page 36). However, she claimed she could not get out of bed with only a 10 mg dosage of it. (Exhibit 9F, page 27). She reported occasional numbness and burning in her legs and feet. (Exhibit 9F, page 29). She told her primary care provider she did not like the new pain medications and wanted a different referral. Her primary care provider told her though he could not prescribed controlled substances for her pain. (Exhibit l0F, page 13). From April through June 2016, she continued to report low back pain, stiffness, leg pain, numbness, and weakness. (Exhibit 9F, pages 11, 16, 21, 26). She was referred to physical therapy. (Exhibit 9F, page 20).

In July 2016, she reported having mid and low back pain radiating into her legs with stiffness. She reported starting physical therapy, which increased her pain and improved her activity tolerance. (Exhibit 9F, page 6). In August 2016, she reported constant mid and low back pain that would radiate into her legs. She still reported stiffness and leg pain. She reported intermittent, waxing and waning joint pain. (Exhibit 9F, page 1). She reported her pain was a four out of ten with medications and an eight out of ten without. (Exhibit 9F, page 2).

In October 2016, it was noted she had failed a drug screen and was discharged from her pain clinic. (Exhibit 10F, page 8). Her pain management provider noted she tested positive for a medication not prescribed to her and for missing appointments. (Exhibit 1l F, page 1).

In November 2016, it was noted her back pain was gradually improving since it started. She was scheduled to start seeing a new pain clinic. (Exhibit l0F, page 5). Her primary care provider told her she was not getting any more narcotic medications after that visit and that she must not fail this new pain management clinic. (Exhibit l0F, page 6). In December 2016, she starting seeing a new pain management provider. It was noted she had been discharged from her prior clinic for using Suboxone. She admitted to using someone else's Suboxone again in December. (Exhibit 14F, page 8). She denied having any nausea or vomiting. (Exhibit 14F, page 22).

In late December 2016, she had a positive screening for Methadone. (Exhibit 14F, pages 37, 44). Her new pain management provider gave her a warning. She indicated she had taken medications from other people due to her pain. (Exhibit 14F, page 37). She had been asking for stronger medication. (Exhibit 14F, page 38). She still reported severe pain despite an increase in her Norco. (Exhibit 14F, page 36).

In March 2017, she reported aquatic therapy did not help, but electrical stimulation was helpful. (Exhibit 13F, page 7). It was noted she was sporadically attending physical therapy. (Exhibit 14F, page 34). In April 2017, she reported her back pain felt like a fist was in her back all the time. She was scheduled to get epidural injections. (Exhibit l0F, page 2). She was hopeful her back would improve with this. (Exhibit l0F, page 3). She reported standing for ten minutes caused increased pain and that she could only lift very light weight. She claimed any walking caused increased pain. She indicated she could sit for two hours. (Exhibit 13F, page 3). She did not think physical therapy had helped her pain at all. (Exhibit 14F, page 18). She was discharged from physical therapy, having attended eleven of twelve sessions. She had cancelled three sessions. She was independent with her home exercise programs. (Exhibit 13F, page 1).

In May 2017, she reported that since her gabapentin was increased, she had trouble staying away. She indicated her Norco was not helping, and wanted to know what

else she could take. (Exhibit 14F, page 32). In July 2017, she got a warning letter from her pain management provider for missing two appointments. (Exhibit 14F, page 17). She had missed an appointment due to car trouble and was requesting a refill of medication. She would not be given more medications until she was seen. (Exhibit 14F, page 32).

In September 2017, she reported low back pain radiating to her legs with ankle pain and burning in her feet. (Exhibit 14F, page 3). She reported her pain medications took the edge off and made her more functional. (Exhibit 14F, page 14). In October 2017, she reported her medications were not working. She had been scheduled for procedures, but was denied by her insurance due to lack of conservative therapy. (Exhibit 14F, page 1). She continued to report low back pain with numbness, tingling, paresthesias, and weakness in her legs. She denied any motor problems with her legs. She denied any daytime sleepiness due to her pain medications. (Exhibit 14F, page 11).

In January 2018, she reported having a burning pain and tingling in her legs. She denied any numbness. (Exhibit 15F, page 1). In February 2018, she started another round of physical therapy. She reported having difficulty getting in and out of chairs and often needing her boyfriend's help to get out of bed. (Exhibit 18F, page 1).

On examination since the alleged onset date, she had some decreased range of motion in her lumbar spine. (Exhibit 9F, pages 4, 9, 19, 24, 29, 35; Exhibit 14F, pages 11, 14). At times, she had normal range of motion. (Exhibit 17F, page 2). She also had some lumbar spinal tenderness. (Exhibit 9F, pages 4, 9, 19, 24, 29, 35; Exhibit 14F, pages 18, 23). She had some sensory deficit with reduced sensation to pinprick in the right leg. (Exhibit 9F, pages 4, 9, 19, 24, 29, 35). Her reflexes were reduced. (Exhibit 9F, pages 4, 9, 19, 24, 29, 35; Exhibit 14F, page 11). At times, her reflexes were intact. (Exhibit 17F, page 2). She had reduced strength in her lower extremities. (Exhibit 9F, pages 19, 24, 29, 35; Exhibit 14F, pages 18, 23). Her gait was normal. (Exhibit 9F, pages 4, 9, 19, 24, 29, 35). She had a positive straight leg raise test. (Exhibit 9F, pages 4, 9, 19, 24, 29, 35; Exhibit 14F, pages 11, 14, 18, 23).

Imaging did show a spinal impairment. A January 2013 MRI of the lumbar spine showed grade one spondylolisthesis at L4-L5 with severe foraminal stenosis and degenerative disc disease and disc bulge at L5-Sl with formainal stenosis. (Exhibit IF, page 1; Exhibit 2F, pages 8-9). August 2013 X-rays showed no surgical hardware complications. She had stable anterolisthesis at L4-L5 and pedicle screws at L4, L5, and Sl. (Exhibit 2F, pages 5, 7).

A February 2016 CT scan of the lumbar spine showed stable grade one L4-l5 anterolisthesis and stable vascular L4-L5 disc interspace narrowing. There was lucency around the S1 pedicle screws suggesting loosening. The posterior bone graft at S1 was not mature or had been partially resorbed. (Exhibit 9F, page 43).

4

Additionally, the claimant had hypertension, which was treated with medications. (Exhibit 3F). In November 2015, her hypertension was noted to be benign. (Exhibit 6F, page 3). Her hypertension continued to be benign. (Exhibit 10F, pages 3, 9). Her hypertension was uncontrolled. (Exhibit 10F, pages 5, 11). She was to start home monitoring of her blood pressure. (Exhibit 10F, page 9). She believed her agoraphobia caused her blood pressure to be elevated at examination, and stated her blood pressure was normal when at home. (Exhibit 15F, page 4).

On examination, her blood pressure was often elevated. (Exhibit 3F, page 2; Exhibit 7F, page 3; Exhibit 9F, pages 9, 13, 19, 23, 29, 35; Exhibit 12F, page 3; Exhibit 14F, pages 1, 3, 5, 8, 11, 14, 18, 23; Exhibit 15F, pages 2, 5; Exhibit 17F, pages 3, 5). Rarely, her blood pressure was normal. (Exhibit 6F, page 1; Exhibit 9F, page 4; Exhibit 13F, page 7). Her heart had a regular rate and rhythm with no gallops. (Exhibit 3F, page 3; Exhibit 6F, page 3; Exhibit 9F, pages 9, 35; Exhibit 10F, pages 2, 5, 8, 11, 13; Exhibit 15F, page 4; Exhibit 17F, pages 2, 4). She had normal heart sounds. (Exhibit 3F, page 3; Exhibit 14F, pages 11, 14, 18, 23). Her pulses were intact. (Exhibit 6F, page 3; Exhibit 9F, page 35). She had no edema. (Exhibit 6F, page 3; Exhibit 10F, pages 2, 5, 8, 13; Exhibit 14F, page 23; Exhibit 15F, page 1).

A January 2014 venous Duplex ultrasound of the right lower extremity showed no evidence for deep venous thrombosis. (Exhibit 3F, page 72). Chest X-rays showed the mediastinal silhouette was within normal limits. (Exhibit 3F, page 73).

As for the claimant's asthma, she was a long-term smoker. (Exhibit 9F, page 7). In October 2014, she had a non-productive cough for a week along with a fever and ear congestion. Her symptoms were aggravated by lying down. Her oxygen levels were low. She felt less short of breath after a nebulizer treatment, but was still wheezing and tachypneic. She received two more treatments. She was found to have pneumonia and status asthmaticus. (Exhibit 3F, pages 2-3). She still had wheezing and rales after her treatments and was told to go to the emergency room. (Exhibit 3F, page 4).

In April 2017, she reported having sinus pressure for a month with congestion. She had no cough and her symptoms were worse while smoking. (Exhibit 10F, page 2). In January 2018, she reported having a productive cough for two to three weeks that waxed and waned. (Exhibit 15F, page 4).

On examination, at times, she had normal breath sounds. (Exhibit 6F, page 3; Exhibit 9F, page 35; Exhibit 10F, pages 2, 5, 8, 11, 13; Exhibit 17F, page 5). Her lungs were clear. (Exhibit 14F, pages 11, 14, 18, 23). She had normal respiratory effort. (Exhibit 9F, pages 4, 9, 35; Exhibit 17F, page 2). Once, she had tachypnea and respiratory distress with wheezes and rales. (Exhibit 3F, page 3). Chest X-rays showed the lungs were well expanded and clear. (Exhibit 3F, page 73).

On May 11, 2015, the claimant had a consultative examination with Dr. Ellen Offutt. The claimant reported she could not stand or walk for long due to her back pain. She indicated she could not work because her legs and low back would not allow her to stand for long, which was required by her job. She reported her pain would start in her low back and run down the front of her legs. She described the pain as a burning and tightening. She reported having twinges in her muscles. She reported sitting made her pain better, but her back would become stiff. She also reported having muscle spasm and pain in her neck for the past few weeks. She claimed she needed to sleep in a chair to be comfortable. She claimed her pain medication and physical therapy did not relieve her pain. She would also use an inhaler twice a week. She indicated her asthma was worse in heat and humidity and during pollen season. She did not believe her hypertension was well controlled. She reported having ankle swelling since her back surgery. (Exhibit 4F).

On examination with Dr. Offutt, her blood pressure was elevated. Her oxygen saturation level was good. She walked with a slight limp without an assistive device. She had normal intellectual functioning. She had a slight decrease in excursion and a slight increase in AP diameter. Her lung had a right upper quadrant rhonchi. Her heart had a regular rate and rhythm without murmurs, gallops, or rubs. Her pulses were intact. She had 1+edema. She had tenderness and muscle spasms in the spine. She had positive straight leg raise testing. She had normal grasp, manipulation, pinch, and fine coordination. She had normal reflexes and no muscle atrophy. She had reduced range of motion in her lumbar spine, hip, and knees, but otherwise normal range of motion. She had decreased pinprick sensation in the thumb and two fingers in both hands, but otherwise her sensation was intact. She could walk on her heels with difficulty. She had no difficulty walking on her toes or doing a tandem gait. She could squat with difficulty. (Exhibit 4F).

(Tr. 21–24).

**B. Mental Health**

Turning to the claimant's mental health treatment, she had some history of treatment with a primary care provider. (Exhibit 3F). In November 2015, she was still being given medication for her mood and sleep issues. (Exhibit 6F, page 3). In March 2016, she replied being severely depressed with some suicidal thoughts. She reported was tired of living with her pain. (Exhibit 9F, page 29). In April 2016, she reported her depression was gradually worsening and she was fatigued. She claimed she had not left the couch in three months. (Exhibit 10F, page 13). In May 2016, she reported having fatigue and that one of her medications made her too sedated. (Exhibit l0F, page 10).

In October 2016, she reported she did not want to leave the house unless she had to. (Exhibit l0F, page 8). In November 2016, she reported constant depression

with sweating. She reported having nervous and anxious behavior when she went out in public, but that she was fine at home. (Exhibit 10F, page 5).

In April 2017, she reported her anxiety had been waxing and waning with excessive worry and nervous and anxious behavior. She reported her medication was really helping. (Exhibit 10F, page 2). She was making some progress on her mood. (Exhibit 10F, page 3). In September 2017, she reported wanting to try a different medication, but had to taper off one of her existing medications first. She claimed she did not leave home except for her medical appointments. She claimed she would not sleep for days and then take her medication and sleep "for days". (Exhibit 17F, page 4). In January 2018, she wanted a referral to a mental health provider. (Exhibit 15F, page 1).

On examination, she was alert and oriented. (Exhibit 3F, page 3; Exhibit 9F, pages 4, 9, 19, 24, 29, 35; Exhibit 14F, pages 11, 14, 18, 23; Exhibit 17F, pages 1-2). She had some memory loss. (Exhibit 7F, page 3). Her speech was normal. (Exhibit 6F, page 3; Exhibit 9F, pages 4, 9, 19, 24, 29; Exhibit 10F, page 14; Exhibit 15F, page 1; Exhibit 17F, page 5). Her behavior was normal. (Exhibit 9F, pages 4, 9, 19, 24, 29, 35; Exhibit 15F, page 1; Exhibit 17F, pages 2, 5). At times, she was agitated. (Exhibit 10F, page 14). Her thought content was normal. (Exhibit 6F, page 3; Exhibit 9F, pages 4, 9, 19, 24, 29, 35; Exhibit 17F, pages 2, 5). She reported having hallucinations when she did not sleep. (Exhibit 17F, page 4). She had slowed psychomotor activity. (Exhibit 6F, page 3). She had decreased concentration. (Exhibit 7F, page 3; Exhibit 9F, pages 4, 8, 13, 19, 23, 29, 35; Exhibit 17F, page 4). At times, she had suicidal ideas. (Exhibit 9F, pages 23, 29; Exhibit 10F, page 13; Exhibit 15F, page 1). Other times, she had no suicidal ideas. (Exhibit 10F, page 8; Exhibit 17F, page 4). At times, she was nervous, anxious, dysphoric, or tearful. (Exhibit 6F, page 3; Exhibit 7F, page 3; Exhibit 9F, pages 4, 8-9, 13, 19, 23-24, 29, 35; Exhibit 10F, pages 2, 5, 8, 13-14; Exhibit 15F, pages 1, 4; Exhibit 17F, pages 4-5). She sometimes had a normal mood and affect. (Exhibit 9F, page 35; Exhibit 17F, page 2). Her judgment was intact. (Exhibit 6F, page 3; Exhibit 9F, pages 4, 9, 19, 24, 29, 35; Exhibit 15F, page 1; Exhibit 17F, page 2).

On September 23, 2015, the claimant had a consultative examination with Dr. Sarah Barwick. The claimant reported having depression. She indicated she would either want to do nothing but sleep or not sleep at all. She would feel fatigued and tired and want to be alone. She reported having a problem with alcohol. She reported struggling with focus, task completion, and managing stress due to her physical issues. She indicated she avoid public places. She claimed to have poor sleep because she worried a lot. She reported having panic attacks and indicated she avoided crowds and the outdoors because of them. She indicated she no longer went to the store. She indicated that sometimes she would not shower for a week. She reported reduced involvement with her chores and difficulty managing her finances due to her emotions. She would spend time

7

watching television. She claimed to have no social interaction with friends for a few years. (Exhibit 5F).

On examination with Dr. Barwick, she was tearful. She reported passive suicidal ideation. She was polite and cooperative. She was neat and clean with adequate grooming and hygiene. She walked with a slow gait and breathed heavily. Her speech was normal. She was not easily distracted. She was nervous and had limited eye contact during the mental status exam, but had good eye contact during questioning. She was alert and oriented. She recalled six digits forward. She could recall three of three words after a brief delay. She made two errors with the serial sevens. She could do the serial threes without errors. She could do basic arithmetic. She was estimated to have average intellectual functioning. Her judgment and insight were intact. (Exhibit 5F).

(Tr. 24–26).

### B. The ALJ's Decision

In his decision, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2017, (Tr. 15), and had not engaged in substantial gainful activity since August 31, 2014, the alleged onset date, (*Id.*). He found that Plaintiff suffers from the following severe impairments: degenerative disc disease, hypertension, asthma, major depressive disorder, generalized anxiety disorder, and panic disorder with agoraphobia. (Tr. 16). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (*Id.*).

As for Plaintiff's residual functional capacity ("RFC"), the ALJ concluded:

[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except sit for a total of six hours in an eight-hour day, stand and/or walk for a total of four hours in an eight-hour day; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; no exposure to moving machinery or unprotected heights; occasional exposure to dust, fumes, gases, and extreme cold; no commercial driving; retains the ability to remember and carry out simple repetitive tasks; able to respond appropriately to supervisors and coworkers in a task oriented setting with only occasional public contact and occasional interaction with coworkers; able to adapt to simple changes and avoid hazards in a setting without strict production quotas.

8

(Tr. 18–19).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

Plaintiff asserts two assignments of error. First, she argues that the ALJ improperly evaluated the opinion of her treating physician, Dr. Virostko. (Doc. 12 at 6–9). Second, Plaintiff challenges how the ALJ considered the opinions of two consultative examiners, Drs. Offutt and Barwick. (*Id.*, at 9–13).

### A. Dr. Virostko's Opinion

Two related rules govern how the ALJ was required to analyze Dr. Virostko's opinion.

*Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakely*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937.

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

The ALJ evaluated Dr. Virostko's opinion in this way:

The undersigned has considered the opinion of Dr. Douglas Virostko and the undersigned gives his opinion little weight. In November 2015, she came to her

> primary care provider asking him to complete some forms for disability and asking if he was "on board" with this. Dr. Virostko indicated in his treatment notes that he did not "encourage disability" but thought her symptoms were markedly limiting her ability to function and do gainful employment despite multiple medical and surgical interventions. (Exhibit 6F, page 1). However, at that point, the claimant had not been seen by that provider in over a year. (Exhibit 3F). Such minimal treatment undermines his familiarity with the claimant's functioning and undermines his assertion that she had significant medical intervention at that time. This opinion is also fairly vague and conclusory. In actually completing those forms, he indicated the claimant was able to perform simple, repetitive tasks. He indicated that the claimant could not perform work eight hours a day forty hours a week for fifty weeks a year. When asked if he believed she could work on a regular and continuing basis without an unusual number and length of rest periods including standing and/or walking two hours in an eight-hour day, sitting six or more hours in an eight-hour day, lifting and/or carrying ten pounds occasionally, and a few pounds frequently, he indicated that she could not. (Exhibit 12F, pages 6-7). That question is somewhat vague, in that he does not indicate which of those activities she could not perform. For instance, it is possible he believed she could stand and/or walk for six hours a day, but not sit for six hours a day. Or he could have thought that the claimant could lift and/or carry one hundred pounds frequently and occasionally, but had problems standing and walking for two hours a day. Or he could have thought she could do all those activities, but just needed an unusual number and length of rest periods for any other reason. Simply believing she was limited to that degree in only one of those areas, would result in him answering the question with "no". Without answering each limitation as a separate question, it is not possible to determine what limitations he believed the claimant actually had. He does not actually state what he believed the claimant could do. The ultimate issue of determining disability is a finding reserved for the Commissioner. (20 CPR 404.1527(d) and 416.927(d)). For all of these reasons, this opinion is given little weight.

(Tr. 27–28).

Plaintiff argues that the ALJ failed to apply the controlling weight analysis. (Doc. 12 at 7). The heart of the argument seems to be that the ALJ did not expressly articulate both steps of the two-part analysis. (*See, e.g.*, *id.* at 8–9). But if an ALJ provides valid reasons for refusing to assign controlling weight to an opinion, "failure to adhere to a formal two-step analysis in doing so is not grounds for reversal." *Sanders v. Berryhill*, No. 3:16-CV-263, 2017 WL 10808813, at *2 (S.D. Ohio Aug. 15, 2017), *aff'd sub nom. Sanders v. Comm'r of Soc. Sec.,* No. 17-4079, 2018 WL 5099229 (6th Cir. 2018). Importantly, the written decision need not discuss each step in the

treating physician rule so long as the Court can understand clearly the weight granted to a treating source opinion and the ALJ articulated good reasons for granting that weight. *Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 258 (6th Cir. 2016); *see also Francis*, 414 F. App'x at 805 (holding that so long as a decision permits the claimant and a reviewing court a clear understanding of the reasons for the weight given to a treating source opinion, a Court should look past any procedural errors) (citing *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010)). And this Court previously has held that "[l]ack of objective support (*e.g.*, from treatment notes) for a treating source's opinion, and inconsistency of that opinion with other evidence of record, are valid reasons for both refusing to assign controlling weight to an opinion at step one of the treating rule and for discounting the opinion's weight at step two. 20 C.F.R. § 404.1527(c)(2-4)." *Sanders v. Berryhill*, No. 3:16-cv-263, 2017 U.S. Dist. LEXIS 221201, 2017 WL 10808813, *2 (S.D. Ohio Aug. 15, 2017). Consequently, the ALJ did not err by not expressly articulating the two-step process.

Further, the reasons the ALJ gave for discounting Dr. Virostko's opinion were sound. In brief, the ALJ assigned little weight to the opinion because Plaintiff had not seen Dr. Virostko in over a year and the opinion was vague and conclusory. (Tr. 27). On the first point, the ALJ specifically noted that he found Dr. Virostko's opinion to be less credible because the gap in treatment meant that the doctor was less familiar with Plaintiff's treatment needs and functioning "at that time." (*Id.*). Plaintiff complains that this passage means that the ALJ did not appreciate the long relationship between Plaintiff and Dr. Virostko. (Doc. 12 at 8). But the ALJ cited and relied upon Dr. Virostko's records in other portions of his opinion. (Tr. 21, 23–24 (citing 542–625)). Of note, these records date back to 2009. (*See* Tr. 602–03).

Additionally, the ALJ determined that Dr. Virostko's failure to provide details and delineation for the opined limitations made the opinion less useful. That was not error. *See Gaskin*

*v. Comm'r of Soc. Sec.*, 280 F. App'x. 472, 476 (6th Cir. 2008) (finding the ALJ properly discounted the portion of a medical opinion that he characterized as vague).

**B. Dr. Offutt's Opinion**

Plaintiff next challenges how the ALJ evaluated Dr. Offutt's opinion. In May 2015, Dr. Offutt performed a physical consultative evaluation of Plaintiff. (*See generally* Tr. 626–34). Based upon her evaluation, Dr. Offutt opined that Plaintiff's ability to bend, stoop, lift/carry, walk, crawl, squat, and push/pull heavy objects would be severely impaired due to her current back, leg, and neck pain. (Tr. 630).

The ALJ assigned this opinion some weight because the ALJ found Dr. Offutt's opinion to be somewhat vague. (Tr. 24, 27). More specifically, he determined that while Dr. Offutt indicated that Plaintiff had limitations, she failed to express the degree of such limitations in vocationally relevant terms. (Tr. 27). Plaintiff asserts that, given these circumstances, the ALJ should have re-contacted Dr. Offutt for clarification, pursuant to 20 C.F.R. § 404.1519p. (Doc. 12 at 11).

Under 20 C.F.R. § 404.1519p(b), the agency will re-contact a consultative examiner for clarification when the examiner's report is "inadequate or incomplete." Plaintiff, however, has not demonstrated that Dr. Offutt's report was inadequate or incomplete. Notably, the regulations expressly state that a report is not rendered incomplete if it is missing a medical opinion, *i.e.,* a statement about what the claimant can do despite her impairments. 20 C.F.R. § 404.1519n(c)(6); *see Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 122 (6th Cir. 2016) ("[A] consultative examiner's report is not rendered incomplete by the absence of a statement about what a claimant can still do despite his limitations.") (citing 20 C.F.R. §§ 404.1519n(c)(6); 416.919n(c)(6)). Significantly, Dr. Offutt's report included a discussion of Plaintiff's subjective complaints, a history of her impairments, objective findings, and diagnoses. (Tr. 626–34).

Consequently, the ALJ did not err by not re-contacting Dr. Offutt, despite finding her opinion to be somewhat vague. *See Dooley*, 656 F. App'x at 122 (ALJ not required to contact a consultative examiner when the ALJ found the opinion to be vague and unsupported by the evidence); *Ingram v. Berryhill*, 1:17CV2163, 2019 WL 5634345, *12 (N.D. Ohio Aug. 17, 2018) (finding that ALJ had no duty to request clarification from consultative examiner although he found opinion vague); *Hamilton v. Comm'r of Soc. Sec.*, 1:15-cv-945. 2016 WL 4771238, *5 (W.D. Mich. Sept. 14, 2016) (finding an ALJ did not have to contact a consultative examiner whose opinion the ALJ found vague). Importantly, the ALJ's decision demonstrates that he considered the record as a whole and was able to assess Plaintiff's RFC based on such without re-contacting Dr. Offutt. (*See* Tr. 18–28).

### C. Dr. Barwick's Opinion

Finally, Plaintiff contends that the ALJ improperly evaluated Dr. Barwick's opinion. In September 2015, Dr. Barwick performed a psychological consultative evaluation of Plaintiff. (Tr. 635–42). Plaintiff reported symptoms relating to depression and anxiety (Tr. 636–37), but she denied any involvement in mental health counseling and indicated that her primary care physician managed her psychotropic medications. (Tr. 637). Plaintiff was tearful during examination, but she was polite and cooperative; neat and clean with adequate grooming and hygiene; had normal speech; was not easily distracted; was alert and oriented; recalled six digits forward; could recall three of three words after a brief delay; did serial threes without errors; and performed basic arithmetic. (Tr. 638). Dr. Barwick estimated Plaintiff had average intellectual functioning and her judgment and insight were intact. (Tr. 639).

Ultimately, Dr. Barwick diagnosed severe major depressive disorder, generalized anxiety disorder, and panic disorder with agoraphobia. (*Id.*). And Dr. Barwick expressed the opinion that

Plaintiff's ability to understand, remember, and carry out instructions and her ability to respond appropriately to supervision and to coworkers in a work setting were intact. (*Id.*). But Plaintiff's abilities in maintaining attention and concentration, maintaining persistence, and pace, and performing simple and multi-step tasks was limited. (*Id.*). Likewise, Dr. Barwick opined that Plaintiff's ability to respond appropriately to work pressures in a work setting was limited. (*Id.*).

The ALJ gave Dr. Barwick's opinion concerning Plaintiff's mental limitations "some weight." (Tr. 25–27). The ALJ reasoned that Dr. Barwick's opinion was consistent with her examination findings, but the opinion was somewhat vague and non-specific in explaining the extent of Plaintiff's limitations in certain areas. (Tr. 27).

Plaintiff first argues that Dr. Barwick's opinion was not vague, and the ALJ erred by concluding otherwise. (Doc. 12 at 11–12). But, when asked to describe Plaintiff's abilities and limitations in "maintaining attention and concentration, maintaining persistence and pace, and performing both simple and multi-step tasks," Dr. Barwick generally indicated that Plaintiff's "abilities in this area are limited," without further explanation. (Tr. 640–41). So it was not unreasonable for the ALJ to classify this opinion as vague to the extent the opinion did not offer the measure of Plaintiff's limitations. Further, Plaintiff's reliance on the state agency reviewing psychologists, Cindy Matyi, Ph.D., and Carl Tishler, Ph.D., does her more harm than good. (*See* Doc. 12 at 11–12). Plaintiff argues that these psychologists did not find Dr. Barwick's opinion vague; so the ALJ should have understood it, too. Although those reviewers gave great weight to Dr. Barwick's opinion, these psychologists opined that Plaintiff was not "significantly" limited in her ability to carry out very short and simple instructions and further explained that Plaintiff could carry out simple and occasionally complex tasks and make simple decisions. (Tr. 233–35, 252–

54, 269–71, 286–88). Importantly, those limitations are consistent with the ALJ's RFC finding. (*See* Tr. 19).

Plaintiff additionally contends that the ALJ should have re-contacted Dr. Barwick given the conclusion that the opinion was vague. (*See* Doc. 12 at 11). This assertion again fails, and the ALJ's determination that Dr. Barwick's opinion was somewhat vague and non-specific did not render the doctor's report inadequate or incomplete thereby requiring the ALJ to re-contact her. *See Dooley*, 656 F. App'x at 122 (ALJ not required to contact a consultative examiner when the ALJ found the opinion to be vague and unsupported by the evidence); *Ingram*, 2019 WL 5634345 at *12 (finding that ALJ had no duty to request clarification from consultative examiner although he found opinion vague); *Hamilton*, 2016 WL 4771238 at *5 (finding an ALJ did not have to contact a consultative examiner whose opinion the ALJ found vague). Notably, Dr. Barwick's report included a discussion of Plaintiff's impairments and subjective complaints, the mental status examination findings, and diagnoses and prognosis. (Tr. 635–41).

Further, in addition to considering Dr. Barwick's opinion, the ALJ considered the other record evidence relating to Plaintiff's mental condition and reasonably assessed her mental RFC. For instance, the ALJ considered that Plaintiff reported that her mental conditions improved with medication. (Tr. 25, 697). According to medical records, Plaintiff's antidepressants were helping. (Tr. 697). The ALJ also considered that Plaintiff often demonstrated normal findings on examinations. (Tr. 25). For instance, the ALJ considered that the record evidence indicated that Plaintiff was alert and oriented. (Tr. 25, 545, 656, 661, 671, 676, 681, 687, 760, 763, 767, 772, 822). In addition, the ALJ noted examinations where Plaintiff demonstrated normal speech (Tr. 25, 645, 656, 661, 671, 676, 681, 709, 815, 825); normal behavior (Tr. 25, 656, 661, 671, 676, 681, 815, 822); normal thought content (Tr. 25, 645, 656, 661, 671, 676, 681, 687, 822); normal

mood and affect (Tr. 25, 687, 822); and intact judgment (Tr. 25, 645, 656, 661, 671, 676, 681, 687, 815, 822).

Further, the ALJ considered Plaintiff's activities, specifically noting that Plaintiff was focused enough to drive. (Tr. 17, 206). *See Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) (recognizing that the ALJ's decision should be read as a whole). The ALJ also considered that Plaintiff was able to do light household chores. (Tr. 18, 475). Thus, ALJ's decision demonstrates that he reasonably assessed Plaintiff's mental RFC finding based on the overall record evidence, and there was no need to re-contact Dr. Barwick.

## IV. CONCLUSION

In sum, although Plaintiff contends that the ALJ should have assessed greater weight to the opinions from Drs. Virostko, Offutt, and Barwick, she has not shown that the ALJ's consideration of those opinions was outside the ALJ's permissible "zone of choice" that grants ALJs discretion to make findings without "interference by the courts." *Blakley*, 581 F.3d at 406. While the record included opinion evidence that could support more than one conclusion, the ALJ considered the evidence and explained his reasons for assessing the opinions as he did. *See Jenkins v. Chater*, 76 F.3d 231, 233 (6th Cir. 1996) ("[i]t is within the authority of the ALJ to resolve any conflicts among" physicians' opinions). The Commissioner's decision must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). Consequently, it is **RECOMMENDED** that that Plaintiff's Statement of Errors (Doc. 12) be **OVERRULED** and that judgment be entered in favor of Defendant.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: March 16, 2020    /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE